IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MCSWINE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

FREDERICK E. MCSWINE, APPELLANT.

Filed August 11, 2020.    No. A-18-1082.

Appeal from the District Court for Lancaster County: SUSAN I. STRONG, Judge. Affirmed.

Jason E. Troia, of Dornan, Troia, Howard, Breitkreutz & Conway, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Frederick E. McSwine, also known as Frederick E. Johnson, was convicted by a jury of terroristic threats, kidnapping, first degree sexual assault, and use of a deadly weapon to commit a felony. McSwine now appeals from an order of the Lancaster County District Court denying his request for an evidentiary hearing on all but one of his postconviction claims. We affirm.

## II. BACKGROUND

### 1. FACTUAL BACKGROUND

In McSwine's direct appeal, this court reversed his convictions due to prosecutorial misconduct and defense counsel's failure to timely object to the prosecutor's comments at issue, and we remanded for a new trial. See *State v. McSwine*, 22 Neb. App. 791, 860 N.W.2d 776 (2015)

(*McSwine I*). That decision was reversed by the Nebraska Supreme Court. See *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016) (*McSwine II*). On remand to this court, we affirmed McSwine's convictions. See *State v. McSwine*, 24 Neb. App. 453, 890 N.W.2d 518 (2017) (*McSwine III*). The following factual summary is from *McSwine I*:

The State filed a criminal complaint charging McSwine with terroristic threats, kidnapping, first degree sexual assault, and use of a weapon to commit a felony. The charges against McSwine stem from an incident which occurred between McSwine and C.S. in October 2012. McSwine and C.S. knew each other prior to October 2012 because McSwine had been employed at a gas station that C.S. had frequented. However, the extent of the relationship was disputed at trial.

Evidence adduced by the State established that on the morning of October 13, 2012, McSwine knocked on the door to C.S.' apartment and asked if he could come in the apartment and use the bathroom. This was not the first occasion that McSwine had come to C.S.' apartment and asked to use the bathroom. A few weeks prior to the day in question, McSwine had appeared on C.S.' doorstep with a similar request. On that day, C.S., who was entertaining friends, let him in the apartment. McSwine then left C.S.' apartment immediately after going into the bathroom.

On October 13, 2012, when McSwine again appeared on C.S.' doorstep requesting to use her bathroom, the only other person in her apartment was her boyfriend, who was asleep in her bedroom. She let McSwine into the apartment, and after he went into the bathroom, he returned to the doorway, threatened C.S. with a "sharp instrument," and forced her from the apartment and into his car. McSwine then drove to three separate, isolated areas where he forced C.S. to engage in various sexual acts. After keeping C.S. with him for approximately 5 hours, McSwine permitted C.S. to flee his car. She then ran to a nearby home where the residents called law enforcement.

McSwine disputed the evidence presented by the State. During his trial testimony, he testified that on the morning of October 13, 2012, C.S. accompanied him to his car willingly and consented to engaging in various sexual acts with him. He also testified that at some point during their encounter, C.S. became upset with him after she discovered that he had lied to her about having a charger for his cellular telephone in the car. After she became upset, she began to accuse McSwine of "using [her] for sex." She then asked to get out of his car, and McSwine stopped the car on the side of a road in order to permit her to leave. During closing arguments, McSwine's counsel argued that C.S. concocted the story about being kidnapped and sexually assaulted because she was angry with McSwine and because she did not want to get in trouble with her boyfriend or with her parents.

After hearing all of the evidence, the jury convicted McSwine of all four charges.

*Id.* at 793-94, 860 N.W.2d at 780. McSwine filed a motion for new trial after the jury returned its guilty verdict; that motion was denied. Thereafter, the district court sentenced McSwine to a total of 56 years 8 months to 85 years in prison. McSwine appealed to this court.

## 2. Direct Appeal

### (a) *McSwine I*

On direct appeal, McSwine was represented by new counsel and assigned five errors, including ineffective assistance of his trial counsel. See *McSwine I*. This court addressed claims that the district court erred in overruling McSwine's motion for new trial, which motion was based on alleged prosecutorial misconduct, and that his trial counsel was ineffective by failing to timely object to the alleged misconduct. The evidence relevant to these claims were multiple text messages sent from McSwine to his wife and his friend on October 13, 2012, after C.S. left his car and ran to a nearby residence. We described those messages in *McSwine I*:

> The first collection of text messages was sent from McSwine to his wife. In those messages, he tells her that he "messed up bad" and that "[c]ops are probably going to be looking for me [and] if they are I'm going to run." McSwine apologizes to his wife and indicates that he "[doesn't] deserve [her and wished he] didn't f*** everything up." In a later text message from McSwine to his wife, he asks her if she "would give [him] up even if [he] was dead wrong and did some foul s***." McSwine then discusses running away to Mexico or to a "reservation."
>
> The second collection of text messages was sent from McSwine to a friend. In these messages, McSwine indicates that he got himself into trouble, that he "might be taking a trip," and that he doesn't know "what [he] was thinking." McSwine then states that he "f*** this all up."

*McSwine I* at 795-96, 860 N.W.2d at 781.

During trial, the State suggested the text messages indicated McSwine's feelings of guilt and remorse about kidnapping and sexually assaulting C.S. But McSwine testified that the messages had nothing to do with C.S., rather, the messages were about his unrelated trespassing incident at a residence earlier on October 13, 2012.

During closing arguments, the prosecutor specifically disputed McSwine's testimony about the motivation for the text messages, and on two separate occasions told the jury that there was no evidence to support McSwine's testimony that he had trespassed through a residence. McSwine's counsel did not object to the prosecutor's comments. This court found that the prosecutor's comments were false and misleading and constituted prosecutorial misconduct. Although no evidence of the trespass was offered or admitted at trial, the prosecutor knew there was evidence of such because during discovery, the prosecutor forwarded to defense counsel police reports that McSwine was a suspect in a trespassing incident after having been identified by the homeowner. Thus, the prosecutor's statements that there was no evidence to support McSwine's testimony about the trespass were misleading in that they made it appear to the jury as though McSwine's explanation about why he sent the incriminating text messages lacked any credibility, when, in fact, there was evidence the McSwine had committed other criminal acts on October 13, 2012, which in no way involved C.S. We ordered a reversal of McSwine's convictions due to the plain error of the prosecutorial misconduct and to defense counsel's failure to timely object to the

prosecutor's statements at issue. Without addressing McSwine's other claims, we remanded for a new trial.

### (b) *McSwine II*

The State petitioned for and was granted further review of *McSwine I* by the Nebraska Supreme Court. See *McSwine II*. The Supreme Court noted that the evidence to support McSwine's position about what the text messages referred to was not offered into evidence. Although agreeing that the State had knowledge of the police reports about the trespassing incident, the Supreme Court disagreed that the jury was misled or unduly influenced by the prosecutor's closing argument because "the jury was well instructed as to what 'evidence'" meant within the context of the trial. *McSwine II*, 292 Neb. at 576, 873 N.W.2d at 414. The Supreme Court concluded that the prosecutor's statements were not misconduct, but even if they were, those statements were not so prejudicial as to violate McSwine's due process rights. The Supreme Court concluded that because the prosecutor's statements were not misconduct, defense counsel could not be deficient for failing to object to those statements. The *McSwine I* decision was reversed, and the cause was remanded back to this court for consideration of any remaining assignments of error.

### (c) *McSwine III*

On remand, this court affirmed all of McSwine's convictions. See *McSwine III*. We also addressed McSwine's remaining assignments of error, including that his trial counsel was ineffective for a number of reasons. McSwine claimed that his trial counsel was ineffective because counsel: (1) failed to adequately prepare his defense by not deposing C.S. prior to trial and not obtaining video surveillance of McSwine's previous encounters with C.S. from the gas station where he worked; (2) failed to offer evidence relevant to McSwine's consent defense, including evidence of a prior sexual relationship between McSwine and C.S., sufficient evidence that McSwine committed trespass on the morning of the assault, and evidence that a friend and fellow inmate who testified against him had access to police reports about the assault; (3) failed to subject C.S. to a handwriting analysis to prove that she wrote a note; (4) failed to strike from the jury a prospective juror who was the brother of a law enforcement officer who had participated in the investigation that led to McSwine's arrest; and (5) failed to object to the State's repeated attempts to portray C.S. as sexually naive. We concluded that the record was insufficient to adequately review claims 1 and 2 on direct appeal. We rejected assertions within claims 3, 4, and 5 above, finding that McSwine could not show that he was prejudiced.

McSwine petitioned the Nebraska Supreme Court for further review of *McSwine III*, but his petition was denied on March 23, 2017.

### 3. MOTION FOR POSTCONVICTION RELIEF

On March 21, 2018, McSwine, now represented by different counsel, filed a motion for postconviction relief in which he alleged that his rights under the state and federal Constitutions were violated. In addition to claiming actual innocence as to all of his convictions, McSwine also raised a number of claims of ineffective assistance of trial counsel and appellate counsel. His claims of ineffective assistance of counsel were: (1) trial counsel failed to support McSwine's

defense with evidence proving the trespass that prompted the text messages used against him by the prosecution; (2) trial counsel failed to impeach C.S.' testimony through use of Steven Blake's testimony, and appellate counsel failed to allege that ineffectiveness on direct appeal; (3) trial counsel failed to impeach C.S.' testimony through the use of the "note" with directions to McSwine's residence in C.S.' penmanship, and appellate counsel failed to allege that ineffectiveness on direct appeal; (4) trial counsel failed to impeach C.S.' testimony by recalling her to confront her with Deputy William Ziemer's testimony that McSwine's penis did not present with any injury consistent with her account, and appellate counsel failed to allege that ineffectiveness on direct appeal; (5) trial counsel failed to impeach C.S.' testimony by recalling her to confront her with N.B.'s testimony that C.S. told him a name after McSwine was allowed into her residence, and appellate counsel failed to allege that ineffectiveness on direct appeal; (6) trial counsel failed to secure an expert witness to establish C.S. as the author of the "note," and appellate counsel failed to allege that ineffectiveness on direct appeal; (7) trial counsel failed to attempt to introduce evidence of McSwine's prior sexual relationship with C.S. and trial counsel prevented McSwine from answering the prosecution's question about whether he had previously had sex with C.S.; (8) trial counsel failed to ask the trial court to clarify the testimony stricken from Deborah Schmucker, and appellate counsel failed to allege that ineffectiveness on direct appeal; (9) trial counsel failed to object to witness Benjamin Isley testifying about McSwine trying to obtain a firearm, "going to hold court on the street," and the related questioning that followed, and appellate counsel failed to allege that ineffectiveness on direct appeal; and (10) trial counsel failed to move in limine and object to the State offering evidence concerning McSwine's resistance to law enforcement when he was arrested and in asking similar questions during direct examination of McSwine, and appellate counsel failed to allege that ineffectiveness on direct appeal. McSwine requested an evidentiary hearing on his claims.

In its response filed on May 25, 2018, the State conceded that the record was insufficient to address McSwine's first ineffective assistance of counsel claim--that trial counsel failed to support McSwine's defense with evidence proving the trespass; the State requested the district court grant an evidentiary hearing on that issue. The State sought denial of an evidentiary hearing on all the rest of McSwine's claims on various legal grounds, i.e. he cannot show actual innocence, his claims against trial counsel were procedurally barred because they were not raised on direct appeal, and he failed to show that he was prejudiced by counsels' performance.

In its October 25, 2018, order, the district court granted McSwine's request for an evidentiary hearing on his claim regarding evidence that should have been offered to support his version of what prompted his text messages. However, the district court denied McSwine's request for an evidentiary hearing on the remaining claims. The district court found that McSwine's claim regarding the failure to secure an expert witness to establish that C.S. authored a "note" was specifically raised and decided on direct appeal and, thus, was procedurally barred. As to McSwine's claim regarding his trial counsel's failure to offer evidence of McSwine's alleged prior sexual relationship with C.S., which claim had been raised but not resolved on direct appeal, the district court found that McSwine could not show that his trial counsel was ineffective. With respect to McSwine's remaining claims of ineffective assistance of counsel, the district court found or otherwise implied that McSwine was procedurally barred from raising the ineffective assistance

of trial counsel because such claims were not raised on direct appeal. And, as to McSwine's claims that appellate counsel was ineffective on direct appeal for failing to raise the ineffectiveness of trial counsel claims, the district court found that there were no facts which overcame the presumption that appellate counsel acted reasonably in raising all viable issues on appeal. The district court also found that McSwine did not establish that he was actually innocent.

### 4. NOTICE OF APPEAL

On November 16, 2018, McSwine filed his notice of appeal from the district court's October 25 order.

## III. ASSIGNMENTS OF ERROR

McSwine claims that the district court erred by (1) denying him an evidentiary hearing on the issues raised in his motion for postconviction relief, (2) finding that he did not establish actual innocence, and (3) denying him postconviction relief.

## IV. STANDARD OF REVIEW

In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief. *State v. Martinez*, 302 Neb. 526, 924 N.W.2d 295 (2019).

A defendant requesting postconviction relief must establish the basis for such relief, and the findings of the district court will not be disturbed unless they are clearly erroneous. *State v. McHenry*, 268 Neb. 219, 682 N.W.2d 212 (2004).

## V. ANALYSIS

### 1. POSTCONVICTION IN GENERAL

Postconviction relief is available to a prisoner in custody under sentence who seeks to be released on the ground that there was a denial or infringement of his or her constitutional rights such that the judgment was void or voidable. *State v. Martinez, supra*.

A court must grant an evidentiary hearing to resolve the claims in a postconviction motion when the motion contains factual allegations which, if proved, constitute an infringement of the defendant's rights under the Nebraska or federal Constitution. *State v. Martinez, supra*. If a postconviction motion alleges only conclusions of fact or law, or if the records and files in the case affirmatively show that the defendant is entitled to no relief, the court is not required to grant an evidentiary hearing. *Id*.

It is well established that, within a postconviction proceeding, an order granting an evidentiary hearing on some issues and denying a hearing on others is a final, appealable order as to the claims denied without a hearing. *State v. Koch*, 304 Neb. 133, 933 N.W.2d 585 (2019).

### 2. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her

counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Martinez, supra*. To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. Martinez, supra*. A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome. *Id*. The two prongs of this test may be addressed in either order. *Id*.

When a defendant's trial counsel is different from his or her appellate counsel, all issues of ineffective assistance of trial counsel that are known to the defendant or are apparent from the record must be raised on direct appeal. See *State v. Dubray*, 294 Neb. 937, 885 N.W.2d 540 (2016). If the issues are not raised, they are procedurally barred. *Id*.

When a claim of ineffective assistance of appellate counsel is based on the failure to raise a claim on appeal of ineffective assistance of trial counsel (a layered claim of ineffective assistance of counsel), an appellate court will look at whether trial counsel was ineffective under the *Strickland* test. *State v. Allen*, 301 Neb. 560, 919 N.W.2d 500 (2018). If trial counsel was not ineffective, then the defendant was not prejudiced by appellate counsel's failure to raise the issue. *Id*. Much like claims of ineffective assistance of trial counsel, the defendant must show that but for counsel's failure to raise the claim, there is a reasonable probability that the outcome would have been different. See *id*.

We review for error only the denied ineffective assistance of counsel claims for which McSwine presents argument in his brief on appeal. See *State v. Lotter*, 301 Neb. 125, 917 N.W.2d 850 (2018) (alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court). All claims before this court for review were asserted against both McSwine's trial counsel and appellate counsel. With one exception explicitly noted below, the claims as alleged against McSwine's trial counsel were not preserved for postconviction review as they could have been litigated on direct appeal and, thus, were procedurally barred (but those same claims as alleged against his appellate counsel were not procedurally barred). See, *State v. Dubray, supra*; *State v. Allen, supra*.

(a) Failure to Impeach C.S.' Testimony
With Other Witnesses' Testimony

The following three claims regard testimony from three State witnesses (Steven Blake, Deputy Ziemer, and N.B.) that allegedly contradicted points of C.S.' testimony. Those claims were premised on the State having called C.S. before those three other State witnesses, and then neither the State nor the defense ever recalling C.S. to testify. Referring to various parts of the record that McSwine believed called C.S.' version of events into doubt, McSwine claimed the establishment of credibility was essential to the jury's determination of guilt or innocence. Indeed, in *McSwine I*, this court noted that credibility of the witnesses was a key factor and that the case ultimately came down to a question of whether the jury believed C.S.' version of events or McSwine's version.

*(i) Blake's Testimony*

In his motion for postconviction relief, McSwine claimed that his appellate counsel was ineffective for failing to allege that trial counsel was ineffective for failing to recall C.S. and impeach C.S.' testimony with the testimony of Blake, who saw two people (McSwine and C.S.) near his property during the occurrence of the events underlying McSwine's convictions.

Blake testified that he saw a vehicle sitting at the end of a "dead end road" near his property. He did not see the vehicle arrive at that location. He was "probably a quarter of a mile" away from the vehicle and was not able to see any people in or around it so he rode his four-wheeler over to the vehicle to investigate. When he drove up to the vehicle, there was nobody inside of it. So he "drove off to the side and just pulled up beside the car" and then "noticed somebody come out of the bush[es]." That man came out of the tree line (situated next to a harvested, open cornfield), pulling up and buttoning and zipping up his pants. Blake recounted the conversation he then had with that man, in which the man indicated he was present with another individual and Blake told the man "'you guys need to leave'" because they did not have permission to be there. Blake did not see any other people at the time he had contact with the man. After talking to the man, Blake turned around and slowly departed but "kept kind of looking over [his] shoulder" and saw two people get in the vehicle, one of whom was the man he told to leave.

C.S. had previously testified that she and McSwine "got out of the trees and started walking across the cornfield, and saw a gentleman riding up on a four-wheeler. And [McSwine] told [her] to hide in the trees." C.S. followed that directive "while [McSwine] went and talked to the gentleman on the four-wheeler." C.S. was not able to get a good look at the person on the four-wheeler because he was "too far away." C.S. watched through the trees as McSwine talked to that man. McSwine told her that she could come back out from the trees after the man started to drive away. C.S. saw the man on the four-wheeler look back over his shoulder a couple times after C.S. exited the trees. On cross-examination, C.S. was asked, "When this man with the four-wheeler approached, [McSwine] went out of the trees and talked with the man[?]" C.S. answered, "We were already walking across the cornfield, and he had me go into the trees."

In his postconviction motion, McSwine argued that trial counsel should have impeached C.S.' version that had C.S. and McSwine "walking across an open cornfield" in light of Blake's subsequent testimony "contradicting" C.S. McSwine argued that had he and C.S. "been walking across the open cornfield, Blake would have seen both parties." The district court found that Blake's testimony was not inconsistent with C.S.' version of the events. We agree.

Even if C.S. was able to see Blake while she was in a cornfield, that does not necessarily mean Blake saw C.S. (or McSwine) at that time. C.S. did not have personal knowledge to testify about what Blake saw. See *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017) (lay witnesses may testify only as to factual matters based upon their personal knowledge). It is not hard to imagine that the State would have objected to C.S. testifying about Blake's own observations or that such an objection would have been sustained. McSwine's claim that trial counsel should have impeached C.S.' testimony though use of Blake's testimony fails. See *State v. Collins*, 299 Neb. 160, 907 N.W.2d 721 (2018) (counsel cannot be ineffective for failing to raise meritless argument). Accordingly, McSwine cannot establish that his appellate counsel was ineffective in relation to

this claim. See *State v. Allen, supra* (if trial counsel was not ineffective, then defendant was not prejudiced by appellate counsel's failure to raise issue).

### (ii) Deputy Ziemer's Testimony

In his motion for postconviction relief, McSwine claimed that his appellate counsel was ineffective for failing to allege that trial counsel was ineffective for failing to impeach C.S.' testimony by recalling her to confront her with Deputy Ziemer's testimony that McSwine's penis did not present with any injury that was consistent with her account.

On cross-examination, C.S. was asked if she remembered, when being interviewed by Deputy Ziemer on the date of the offense, that she told the deputy that she accidentally bit McSwine's penis. At first, C.S. did not remember telling the deputy that, but she then confirmed that she had told the deputy that information on October 13, 2012. The question was generally asked and answered the same way later on during the cross-examination. C.S. was also asked if she remembered telling the sexual assault nurse examiner that she accidentally bit McSwine's penis and there was blood; C.S. answered, "Yes." Near the end of the cross-examination of C.S., McSwine's trial counsel asked if C.S. had opportunities to act out in different ways in response to McSwine's actions, and the following colloquy was had on the record.

> Q [by McSwine's trial counsel] You had opportunities to bite his penis hard?
> A [by C.S.] Yes.
> . . . .
> Q You had opportunities to hurt [McSwine] really bad by biting him?
> A Yes.
> Q And, even though you believed he was going to kill you, you didn't take advantage of any of those opportunities you had to yell, to scream, to run, to injure him, did you?
> A I was afraid that if I did anything to hurt him or to try and get away . . . he would, in fact, hurt me with the pocket knife.
> Q . . . [Y]ou didn't take advantage of any of those opportunities you had?
> A It did not cross my mind.

On cross-examination, the sexual assault nurse examiner who performed the exam of C.S. on October 13, 2012, indicated she had asked C.S. if there were any injuries to the assailant that resulted in bleeding. The sexual assault nurse examiner said C.S. answered that she "accidentally bit his penis and there was blood."

On cross-examination of Deputy Ziemer, McSwine's trial counsel asked if the deputy had examined McSwine's penis when the deputy had contact with McSwine in the early morning hours of October 14, 2012. Deputy Ziemer answered that he had done so but denied that he saw any kind of injury or bleeding on McSwine's penis.

On appeal, McSwine argues "the jury never had the chance to observe the conduct and demeanor of [C.S.] while testifying and while being confronted with the inconsistencies in her version that exposed her for lying and supported McSwine's version." Reply brief for appellant at

7. McSwine notes that the "jury instruction provides guidance to the jury to make a credibility determination at the time they [sic] are testifying." *Id.* at 10.

But the jury was also instructed that it may consider seven other factors to make a credibility decision, including "any other evidence that affects the credibility of the witness or that tends to support or contradict the testimony of the witness." Deputy Ziemer's testimony on cross-examination clearly contradicted C.S.' report she recalled she had made to the sexual assault nurse examiner about the matter at issue. The sexual assault nurse examiner's testimony repeating what C.S. remembered telling the nurse was then heard by the jury after the deputy's testimony. Notably, the trial record shows that C.S. was questioned regarding whether she actually bit McSwine. McSwine's trial counsel ended cross-examination of C.S. in such a way where C.S. generally admitted that although she had the opportunity to do so, she did not take advantage to do a number of things in response to McSwine's actions, such as injuring him by biting him.

The trial record contained sufficient and appropriate evidence from which the jury could assess C.S.' credibility in relation to the reports she made on the date of McSwine's offense about whether she bit McSwine. The jury heard the testimony of all three witnesses and could weigh the witnesses' credibility for themselves. See *State v. Carter*, 241 Neb. 645, 489 N.W.2d 846 (1992) (issue of witness' credibility was one to be decided by jury at trial and postconviction motion could not be used to relitigate that issue). Given that the contradiction was fully established during trial, McSwine cannot show how his trial counsel confronting C.S. with Deputy Ziemer's testimony would have undermined confidence in the outcome of the trial. Therefore, he cannot establish that appellate counsel was ineffective in relation to this claim. See *State v. Allen*, 301 Neb. 560, 919 N.W.2d 500 (2018) (if trial counsel was not ineffective, then defendant was not prejudiced by appellate counsel's failure to raise issue).

### (iii) N.B.'s Testimony

In his motion for postconviction relief, McSwine claimed that his appellate counsel was ineffective for failing to allege that trial counsel was ineffective for failing to impeach C.S.' testimony by recalling her to confront her with N.B.'s testimony that C.S. told him "a name" after McSwine was allowed into her residence whereas C.S. testified that she did not know McSwine's name. We note that by trial, C.S. had wed N.B., who was her boyfriend on October 13, 2012.

The prosecutor asked C.S. if, regarding the time of October 2012, she came to know "a man by the name of Frederick McSwine." C.S. answered, "Not by that name, no." Later on direct examination, C.S. denied that she knew what McSwine's name was as of October 2012. N.B. later testified as follows about what happened after he heard a knock on C.S.' apartment door on October 13, 2012.

> Q [by McSwine's trial counsel] So, after [C.S.] went to answer the door, a little bit later she came back to the bedroom[?]
> A [by N.B.] Correct.
> Q And she said she was going to talk with someone[?]
> A Correct.
> Q And your recollection is that she used a person's name?
> A Correct.

Q A specific name?
A What I remember, yes.
Q Okay. But you don't recall what the name was?
A No.

McSwine's claim as set forth in his motion for postconviction relief rests on trial counsel's failure to impeach C.S.' version "not matching" or "contradict[ing]" N.B.'s version solely on the matter of whether C.S. knew McSwine's name. But C.S.' testimony did not directly contradict N.B.'s testimony. C.S. denied that she knew McSwine's name in October 2012. All N.B. could recall was that C.S. referred to the person at the door by using a specific name. He did not say C.S. referred to McSwine's name. All that could be reasonably deduced from N.B.'s testimony was that C.S. referred to the person at the door by name, which could have been any name out of an infinite pool of possibilities. McSwine's trial counsel could not be deficient for failing to try to impeach C.S.' testimony that she did not know McSwine's name in October 2012, with testimony that did not contradict that statement. See *State v. Collins*, 299 Neb. 160, 907 N.W.2d 721 (2018) (counsel cannot be ineffective for failing to raise meritless argument). Therefore, he cannot prove appellate counsel was ineffective for failing to raise the claim on direct appeal that trial counsel was ineffective for failing to orchestrate that impeachment. See *State v. Allen, supra*.

(b) Failure to Impeach C.S.' Testimony With Note

In his motion for postconviction relief, McSwine claimed that his appellate counsel was ineffective for failing to allege that trial counsel was ineffective for failing to impeach C.S.' testimony through the use of exhibit 48.

Exhibit 48, which was received into evidence, is an unsigned and undated note of directions to a location apparently near where McSwine said he lived at the time of October 13, 2012. McSwine's trial counsel questioned C.S. about the note as follows:

Q Do you recognize [exhibit 48]?
A It looks like a piece of paper.
Q With some directions?
A That's correct.
Q Have you ever seen that before?
A No.
Q Is that your handwriting?
A It looks like it could possibly be, but I can't say for sure.
Q So that looks similar to your handwriting?
A Similar, yes.
Q But you don't remember ever writing that note?
A No.
Q But you're saying it's possible you did?
A It looks like my handwriting, but I -- I don't even know where this goes to.
Q Okay. Well, where the directions go to, you mean?
A That's correct.

In his postconviction motion, McSwine complained that C.S. was allowed to avoid the question, "But you're saying it's possible you did?," in regard to whether she had written the note. McSwine argued the note would have supported his consent defense. He asserted that instead of C.S. having a sharp instrument to her throat the entire time he was in her apartment, "C.S. was taking down directions to an area near where [he] lived so as to find his place at a later time so they could get together." McSwine now suggests several questions that could have been asked of C.S. about the note, such as if she wrote the note with her eyes closed or for an explanation of why she wrote the note. But McSwine's claim was not that trial counsel failed to ask how or why C.S. wrote the note. Therefore, those suggested questions are irrelevant to McSwine's claim raised in his postconviction motion and seek to impermissibly broaden it. His claim as stated in his motion was simply that C.S. should have been made to directly answer whether it was "possible" that she wrote the note.

As to a similar claim regarding the note that was rejected by this court, we found that C.S. "essentially admitted" during her testimony that the handwriting on the note matched her handwriting. See *McSwine III*, 24 Neb. App. at 473, 890 N.W.2d at 533. Given our prior determination about this testimony, we find that C.S. also essentially admitted that it was "possible" that she wrote the note. McSwine's trial counsel was not deficient for not making C.S. directly answer the question at issue when it was implicitly established that it was possible that she authored the note. Also, McSwine himself was able to testify that C.S. wrote the note on October 13, 2012. McSwine cannot show a sufficient probability to undermine confidence in the outcome of trial and, thus, he has failed to show prejudice and his ineffective assistance of appellate counsel claim fails in relation to the note. See *State v. Allen, supra* (if trial counsel was not ineffective, then defendant was not prejudiced by appellate counsel's failure to raise issue).

### (c) Failures Related to Absence of Evidence of McSwine's Alleged Prior Sexual Relationship With C.S.

In his postconviction motion, McSwine claimed that his trial counsel was ineffective for failing to attempt to introduce evidence of McSwine's alleged prior sexual relationship with C.S. and then preventing McSwine from answering the State's question about that subject. This claim was raised on direct appeal and preserved for later review. See *McSwine III*. In his postconviction motion, McSwine contended that he made his trial counsel aware of his "secret sexual relationship" with C.S. that "included having sexual intercourse with C.S. prior to the alleged events." McSwine alleged in his postconviction motion that "[n]ot only did trial counsel neglect to file timely notice prior to trial that the defense intended to offer evidence of prior sexual conduct between C.S. and [McSwine], but trial counsel closed the door to the opportunity that the prosecutor had opened." He claimed these actions fell below the standard of a lawyer with ordinary training and skill in criminal law, and there was "no reasonable trial strategy that would justify not attempting to establish the prior consensual sexual relationship between C.S. and [McSwine] or allowing it to come in at the prosecutor's doing." McSwine contended that "[w]ith the lack of evidence supporting C.S.'s version of events," had this evidence come in, a "fair probability exists that the outcome would have been different in favor of [McSwine] as C.S. would have been impeached and at a minimum the presence of reasonable doubt would have resulted in not guilty verdicts."

In denying McSwine relief on this claim, the district court acknowledged that this court had concluded in *McSwine III* that McSwine's claim that his trial counsel was ineffective for not introducing evidence of a prior sexual relationship between McSwine and C.S. could not be adequately reviewed on direct appeal. However, the district court found that "upon closer examination," the record was sufficient to decide the issue without an evidentiary hearing. See *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019) (when appellate court finds, on direct appeal, that record is not sufficient to resolve claim of ineffective assistance, it should not be misunderstood as finding that claim will necessarily require evidentiary hearing if raised in motion for postconviction relief, because that determination is governed by entirely different standard; postconviction court is not precluded from later finding existing record affirmatively refutes claim, particularly since specific allegations of prejudice were not required to be made on direct appeal). We agree with the district court's denial of relief on this issue without an evidentiary hearing for the following reasons.

Prior to trial, the State filed a motion in limine that was addressed at a hearing that McSwine personally attended. During the hearing, McSwine's trial counsel indicated that a paragraph of the State's motion regarded the "Rape Shield." Defense counsel stated, "I don't intend to offer any evidence of prior specific instances . . . of sexual behavior." The State's motion was granted. The district court ordered counsel to request a sidebar conference if something came up during trial that led a party to believe there was a need to go into something covered by the motion.

During trial on direct examination, McSwine said he knew C.S. from when he worked at the gas station that C.S. frequented. He denied having any contact with C.S. outside of the gas station when he worked there. At one point, McSwine referred to C.S. by an incorrect last name. On cross-examination, McSwine denied that he knew C.S. by her first and last name on October 13, 2012; he knew her by a shortened version of her first name. He said C.S. "probably" knew his first and last name but also said he knew C.S. knew his first name. He worked at the gas station from May 21, 2011, to January 13, 2012. C.S. would "maybe" go to the gas station three times a week. His contact with C.S. was minimal "[a]t first." He believed that he and C.S. became friends. McSwine said C.S. gave him her telephone number but he did not put it in his telephone because he had previously been caught cheating by his wife. He denied ever giving C.S. his number or calling her. The State then asked McSwine, "[P]rior to October 13th, 2012, you had never had sex with [C.S.] before[?]" Before McSwine answered, his trial counsel requested and was allowed to approach the bench with opposing counsel where defense counsel argued that the State could not "walk into" a rape shield issue and complain about the answer received. Defense counsel predicted McSwine's answer would be that "he did have sex with her once before." Defense counsel argued, "I don't want to hear [the State] complaining about me not doing anything with rape shield, because I didn't ask the question or go anywhere near that." The State withdrew its question.

In its order denying postconviction relief on this issue, the district court stated, "Any evidence pertaining to specific instances of past sexual behavior of the victim, C.S., had been ruled inadmissible at trial pursuant to the State's Motion in Limine under Neb. Rev. Stat. § 27-412," which had been previously granted. "Thus, even if a prior sexual relationship existed, it was not admissible at trial unless the defendant had first made a showing outside the presence of the jury."

Under Nebraska's rape shield statute in effect at the time of McSwine's trial, evidence of a victim's prior sexual behavior or sexual predisposition was not admissible except under the following limited circumstances in a criminal case:

       (i) Evidence of specific instances of sexual behavior by the victim offered to prove that a person other than the accused was the source of semen, injury, or other physical evidence;

       (ii) Evidence of specific instances of sexual behavior of the victim with respect to the accused offered by the accused to prove consent of the victim if it is first established to the court that such behavior is similar to the behavior involved in the case and tends to establish a pattern of behavior of the victim relevant to the issue of consent; and

       (iii) Evidence, the exclusion of which would violate the constitutional rights of the accused.

Neb. Rev. Stat. § 27-412(2)(a) (Cum. Supp. 2012). Nebraska's rape shield statute serves two purposes: (1) it protects rape victims from "grueling cross-examination about their past sexual behavior or sexual predisposition that too often yields testimony about questionable evidence," and (2) it prevents the use of evidence of the witness' past sexual conduct "from which to infer consent or undermine the witness' credibility." *State v. Swindle*, 300 Neb. 734, 751, 915 N.W.2d 795, 809 (2018). "The rape shield statute is not meant to prevent defendants from presenting relevant evidence, but to deprive them of the opportunity to harass and humiliate the complaining witness and divert the jury's attention to irrelevant matters." *Id*. A party intending to offer evidence under § 27-412(2) was generally required to file a written motion at least 15 days before trial specifically describing the evidence and stating the purpose for which it was offered and to serve a motion on all parties and notify the victim or the victim's guardian or representative. See § 27-412(3)(a). Before admitting the evidence, the court had to conduct an in camera hearing. See § 27-412(3)(b).

In its order denying McSwine an evidentiary hearing on this issue, the district court pointed out that "[t]here is no record of any such filing by [McSwine] prior to trial," and that to the contrary, "trial counsel affirmatively stated at the pretrial hearing that [McSwine] would not include any evidence of past sexual behavior of the victim." The district court noted that "when the State asked [McSwine] whether he had engaged in sex with C.S. before, defense counsel properly asked to approach the bench." Therefore, McSwine's counsel "cannot be held to be ineffective for following the Court's ruling." The district court added that McSwine's trial counsel was "well-versed" on how to present evidence under § 27-412(2).

The district court found the record supported a determination that "defense counsel consciously chose not to present evidence of a prior sexual relationship between [McSwine] and C.S." The district court pointed out that in addition to affirmatively stating he would not present evidence of C.S.' past sexual behavior at trial, defense counsel also prevented McSwine from answering the State's question about prior sex with C.S., knowing that McSwine would say he did have sex with her once before. "Thus, [McSwine's] trial counsel was well aware of [McSwine's] potential testimony on this issue. Yet, he did not move to have this evidence admitted as part of

[McSwine's] consent defense. Clearly, this was a strategic decision made by [McSwine's] trial counsel."

Citing to *State v. Johnson*, 243 Neb. 758, 502 N.W. 477 (1993), the district court noted that "[t]actical or strategic defense decisions of trial counsel will not be second-guessed on a motion for postconviction relief unless the defendant meets his burden of proof showing deficient representation and prejudice." Quoting from *Nix v. Whiteside*, 475 U.S. 157, 166, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986), the district court also noted that a counsel's duty of loyalty to his client and duty to advocate his client's cause "'is limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth. Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law.'" The district court also quoted from *Murph v. U.S.*, 12 F. Supp. 3d 557 (E.D.N.Y. 2014), where the court refused to find that failing to suborn perjury constituted ineffective assistance of counsel or a cognizable basis of prejudice under *Strickland, supra*.

The district court concluded that there were valid reasons why defense counsel "could have chosen not to present evidence of a past sexual relationship between [McSwine] and C.S.," such as determining that the evidence available was simply not admissible under the rape shield statute. The district court noted that evidence of C.S.' past sexual behavior to prove consent was only admissible if it was similar to the behavior involved in the present case and tended to establish a pattern of behavior by C.S. Notably, C.S. testified that when she was forced to leave her apartment she was not wearing shoes and left behind her identification, money, and cell phone.

McSwine did not plead in his postconviction motion, nor does he argue on appeal, that the alleged prior sexual encounter between McSwine and C.S. involved similar facts or somehow constituted a pattern of behavior by C.S. McSwine argues only that if the jury heard that he and C.S. had an "ongoing secret relationship with prior sexual relations, it would not have been as unlikely that passion and secrecy would have led C.S. to leave in a hurry and without gathering the usual things." Brief for appellant at 22. He claims he had "at least one prior consensual sexual act" with C.S. *Id.* at 21. Again, even if that is true, McSwine does not assert any circumstances of that alleged prior instance to shed light on whether C.S. responded to it in the same way as C.S. did here, leaving her apartment barefoot and without important personal items.

McSwine offers only a conclusory argument that the evidence at issue was "permitted and covered" under § 27-412(2)(a)(ii) and (iii). Reply brief for appellant at 11. He has made no allegation that there was an established pattern of behavior of C.S. relevant to the issue of consent in this case; one alleged prior and undescribed instance of sexual contact between McSwine and C.S. is insufficient to meet the requirements of the rape shield statute. See § 27-412(2)(a)(ii) (evidence of specific instances of sexual behavior of victim with respect to accused and sought to be offered by accused must tend to establish pattern of behavior of victim relevant to issue of consent). If a postconviction motion alleges only conclusions of fact or law, no evidentiary hearing is required. See *State v. Martinez*, 302 Neb. 526, 924 N.W.2d 295 (2019). That basis alone is enough to defeat McSwine's claim regarding the denial of an evidentiary hearing on trial counsel's failure to offer the evidence at issue. See *id*.

### (d) Failure to Object to Jailhouse Informant's Testimony

In his motion for postconviction relief, McSwine claimed that his appellate counsel was ineffective for not alleging that his trial counsel was ineffective for failing to object to certain testimony of Benjamin Isley, a jailhouse informant, set forth below.

During direct examination, Isley recounted that while he and McSwine were in custody in October 2012, McSwine talked about the circumstances of his (McSwine's) arrest, surrounding his interaction with C.S. Isley did not describe McSwine having related anything about a trespassing incident. Isley said McSwine told him that he (McSwine) went to his wife's house after assaulting C.S. McSwine said he had given his clothes to his wife, his wife was furious and had been trying to contact him, and McSwine "snapped" at his wife and said, "'Listen, the police are going to be here. I can't tell you what's going on. I'm not going to tell you what happened, but get rid of these clothes. Burn them.'" Regarding where McSwine went after that, Isley said McSwine knew he needed to get to a place to "hide out." McSwine had been trying to contact Isley "that whole week" and McSwine "didn't know where he was going to go." McSwine "knew that [another friend] had a firearm on him and [McSwine] wanted to try to get the firearm from [that friend]" because "if he was in a situation where he was going to get arrested or was confronted by the police, the way that he described it, he was going to hold court on the street. He wasn't going to prison or to jail." When asked what "holding court in the street" meant, Isley said it meant that "you'd rather die in the streets tha[n] be put in prison by the police." McSwine allegedly felt that the "police were going to be after him, pretty short coming or pretty soon coming" because McSwine saw C.S. run to a stranger's house and "pound" on the door in a "frantic or hysterical" way.

In his postconviction motion, McSwine argued that the "inflammatory" statements he allegedly made portrayed him very unfavorably and "whether the criminal offenses were committed or not, suggest that [he] is an unstable and dangerous person that is a threat to law enforcement." He asserted that his trial counsel should have objected on "403, relevancy, and volunteering information grounds" and moved to strike the testimony.

Isley's testimony was relevant to whether McSwine committed the charged offenses and whether his consent defense was truthful. See *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018) (to be relevant, evidence must be probative and material). The testimony allowed the jury to reasonably infer, without reliance on speculation or propensity reasoning, that McSwine had consciousness of guilt related to his contact with C.S. on October 13, 2012. The testimony corroborated C.S.' account that she did not consent to leaving with and engaging in sexual acts with McSwine that day.

McSwine's alleged statements were relevant to show his consciousness of guilt given the time they were made, the context in which they were made as far as subject matter of the conversation, and the apparent plan to evade an arrest and become threatening or violent if located by law enforcement. See, *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016) (State can show defendant's consciousness of guilt from defendant's inculpatory statements; statements should reasonably support inference of defendant's guilty knowledge of charged crime); *State v. Ely*, 287 Neb. 147, 841 N.W.2d 216 (2014) (after victim shot and killed during perpetration of robbery,

defendant went to different city where he talked to two friends about robbery and being in trouble due to shooting; evidence supported reasonable inference that defendant had guilty conscience and was attempting to avoid apprehension); *State v. Lonnecker*, 237 Neb. 207, 465 N.W.2d 737 (1991) (after deputies identified themselves and shouted their presence inside house, they discovered defendant who was hiding in crawl space; hiding evidenced defendant's guilty conscience about marijuana located on premises which were under his control).

Under Neb. Rev. Stat. § 27-403 (Reissue 2008), relevant evidence may be excluded if its probative value is substantially outweighed by danger of unfair prejudice. Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party. *State v. Oldson, supra*. Unfair prejudice means an undue tendency to suggest a decision on an improper basis. *Id*. Consciousness of guilt is perhaps the strongest evidence that a person is indeed the guilty doer. See *id*. When the evidence is sufficient to justify an inference that the defendant acted with consciousness of guilt, the fact finder can consider such evidence even if the conduct could be explained in another way. *Id*. But if the State's circumstantial evidence only supports an inference through speculation or only supports two equally speculative inferences, a trial court should exclude it when a party has properly invoked § 27-403. See *State v. Oldson, supra*. We note the probative value of Isley's testimony at issue and that speculation was not required to infer that McSwine's alleged statements related to his actions upon C.S. on October 13, 2012, for which he was later charged, tried, and convicted.

Although McSwine says the testimony portrayed him as a "lethal threat to the police," reply brief for appellant at 12, the testimony was only about statements Isley said McSwine made, not McSwine's actual attempted or carried out actions. The district court would have overruled any objection to Isley's testimony as unfairly prejudicial given the highly probative nature of evidence of consciousness of guilt. Trial counsel could not be ineffective for failing to raise a meritless argument. See *State v. Collins*, 299 Neb. 160, 907 N.W.2d 721 (2018). Also, McSwine cannot show he was prejudiced by trial counsel's failure to object on grounds of Isley volunteering information, because even a sustained objection to a narrative would not have stopped the prosecutor from simply asking questions to elicit the same testimony. Therefore, appellate counsel cannot be ineffective for failing to raise these claims. See *State v. Allen*, 301 Neb. 560, 919 N.W.2d 500 (2018) (if trial counsel was not ineffective, then defendant was not prejudiced by appellate counsel's failure to raise issue).

(e) Failures Related to Evidence of McSwine's Arrest

In his postconviction motion, McSwine claimed that his appellate counsel was ineffective for failing to allege that trial counsel was ineffective for failing to move in limine and object to the State offering evidence about his resistance to law enforcement upon arrest and for asking McSwine similar questions.

Deputy Bradley Sturdy testified that he had several conversations with McSwine when McSwine worked at the gas station. McSwine would address the deputy as "Deputy Sturdy." Near the beginning of his night shift on October 13, 2012, Deputy Sturdy was advised of a current sexual assault investigation in which McSwine was a suspect. Around 12:45 a.m. on October 14, the deputy located a person "immediately" recognizable as McSwine but asked McSwine to identify

himself anyway. "There was a long pause, and [McSwine] said, 'Anthony.'" Deputy Sturdy had been notified that McSwine was in possession of "an edged weapon, or a knife." The deputy noticed that McSwine's "right hand was going towards his pocket" so the deputy drew his service handgun and held McSwine at gunpoint, commanding him to get on the ground. McSwine refused to comply and did not "keep his hands up"; Deputy Sturdy "noticed [McSwine's] right hand kept coming down towards his waistline, like if he was going to get something out of his pocket." But the deputy did not see a weapon on McSwine at any time. Deputy Sturdy contacted other deputies for help. Once they arrived, Deputy Sturdy still had McSwine at gunpoint. Deputy Sturdy described how McSwine continued to refuse to comply with requests so the deputies "placed him on the ground" and handcuffed him. After that, McSwine informed that he had a knife in his right pocket. Deputy Sturdy searched McSwine's person and was unable to find the knife.

Deputy Amanda Krause recalled arriving to the scene. She testified, "Deputy Sturdy was attempting to place [McSwine] into custody, and had him against a fence and was trying to get him into custody, but he wasn't complying." McSwine was "kind of pulling away." Deputy Krause agreed that at some point McSwine had to be taken to the ground; another deputy helped Deputy Sturdy do that.

McSwine's trial counsel generally asked McSwine to explain the testimony that he was not compliant with law enforcement. McSwine testified about his version of how the arrest unfolded. He described being compliant and having reached in his pockets after being asked for identification. He said the officer asked him if he had any weapons and that he (McSwine) said he had a knife but that the officer did not find a knife on him.

In his postconviction motion, McSwine argued that his resistance to law enforcement portrayed him negatively. However, the district court noted McSwine's admission that "the jury was aware he was a felon who had been to prison and was presently on parole" and we note that the jury would have already heard Isley's testimony about McSwine's alleged plan to evade an arrest. That all reflected negatively on McSwine.

McSwine also argued that the testimony was not relevant and was unfairly prejudicial. However, McSwine's resistance to arrest in the early morning hours of October 14, 2012 (close in time to his offending acts upon C.S.), was relevant to show consciousness of guilt for the crimes later charged in this action. See *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016) (defendant exhibited consciousness of guilt when he attempted to sneak onto bus leaving Nebraska and then gave false information to security employee and police officer to avoid arrest). Evidence of McSwine's noncooperation with law enforcement under the circumstances allowed the jury to make reasonable inferences from which to consider the veracity of McSwine's consent defense. Further, an objection under § 27-403 to the deputies' testimony about McSwine's resistance to arrest would have been overruled given the highly probative nature of that evidence and other admissible evidence that already called McSwine's compliance with the law and law enforcement into question. Trial counsel could not be ineffective for failing to raise a meritless argument. See *State v. Collins, supra*.

Because an objection to the deputies' testimony would have been overruled, defense counsel's decision to ask McSwine about the arrest was a reasonable strategic way to provide McSwine an opportunity to rebut the deputies' testimony; we cannot say that decision was one of

ineffective assistance. See *State v. Stricklin*, 300 Neb. 794, 916 N.W.2d 413 (2018) (reasonable strategic decision to present particular evidence will not, without more, sustain finding of ineffective assistance of counsel). McSwine's claims of ineffective assistance of trial counsel fail with regard to his arrest. Necessarily, he failed to establish his appellate counsel was ineffective for not assigning those claims on direct appeal. See *State v. Allen, supra* (if trial counsel was not ineffective, then defendant was not prejudiced by appellate counsel's failure to raise issue).

### 3. ACTUAL INNOCENCE CLAIM

McSwine claimed that the evidence offered at trial, in pretrial and in camera hearings, and within the discovery materials, establish that he is actually innocent of the crimes for which he was convicted. The essence of a claim of actual innocence is that the State's continued incarceration of such a petitioner without an opportunity to present newly discovered evidence is a denial of procedural or substantive due process. *State v. Dubray*, 294 Neb. 937, 885 N.W.2d 540 (2016). The threshold to entitle a prisoner to an evidentiary hearing on such a postconviction claim is extraordinarily high. *Id.* Such a petitioner must make a strong demonstration of actual innocence because after a fair trial and conviction, the presumption of innocence vanishes. *Id.*

McSwine's actual innocence claim as set forth in his motion for postconviction relief and on appeal consists of referring to his trial testimony and allegations formed from that to support his version of what happened on October 13, 2012, and pointing out alleged or actual contradictions in C.S.' trial testimony to her prior statements or other witnesses' trial testimony (he cites to the trial record when referring to C.S.' contradictions in his appellate brief). In his reply brief on appeal, McSwine suggests that if the jury would have heard the in camera evidence, then that would have made a difference in that the jury would have known how McSwine would have answered the question "about his past sexual relationship with C.S." Reply brief for appellant at 13. In *McSwine III*, this court concluded that the district court did not err when it prohibited the defense from introducing the evidence that was the subject of the in camera hearing (generally, whether C.S. had previously engaged in oral sex with a nonparty to this action); if admitted, it would not have conclusively proved McSwine's actual innocence. As to the exclusion of that evidence, this court noted:

> Other evidence elicited by both the State and the defense demonstrated that C.S. had a tendency to be untruthful about her past sexual experiences. Accordingly, even if the jury believed that C.S. had lied about never having performed oral sex prior to the day of the assault, such information would probably not have resulted in the jury's forming a different impression of her credibility. And, whether C.S. had previously engaged in oral sex was a collateral issue that did not have any significant bearing on whether she consented to sexual contact with McSwine on the day of the assault.

*McSwine III*, 24 Neb. App. at 466, 890 N.W.2d at 529.

Further, in his postconviction motion, McSwine conceded that the "physical evidence would have been the same under either version [(his or the State's version)]." McSwine's main argument for actual innocence, that C.S.' account of the events cannot be believed, is refuted by the record. The jury heard both the State's and McSwine's versions of events and had sufficient

relevant evidence from which to assess the credibility of those conflicting versions; the jury clearly believed the State's version of the events was credible and, thus, found McSwine guilty as charged.

McSwine has not met the extraordinarily high standard to gain an evidentiary hearing on his actual innocence claim. He alleged no new facts that would support it. If his claim was intended to challenge the sufficiency of the evidence at trial, the time has passed for those arguments. See *State v. Dubray, supra* (claims of insufficiency of evidence that were or could have been raised on direct appeal are procedurally barred from being raised in postconviction action; merely attempting to relitigate issues decided at trial and affirmed on appeal does not make viable actual innocence claim). The district court did not err by denying an evidentiary hearing on this claim.

### 4. DENIED POSTCONVICTION RELIEF

McSwine claims that the district court erred by denying him postconviction relief without an evidentiary hearing on all but one claim. He argues that he would have been able to present evidence on each of the allegations raised in his motion. We disagree. We already concluded that all of McSwine's claims of ineffective assistance of counsel at issue in this appeal failed. The district court did not err by denying an evidentiary hearing on those claims. See *State v. Martinez*, 302 Neb. 526, 924 N.W.2d 295 (2019) (no evidentiary hearing required if postconviction motion alleges only conclusions of fact or law, or if records and files in case affirmatively show defendant is entitled to no relief). We also noted that the remaining denied claims are not before us as they were not specifically argued on appeal; we will not consider a conclusory assertion that he could have presented evidence to support those claims. See *State v. Lotter*, 301 Neb. 125, 917 N.W.2d 850 (2018) (alleged error must be specifically argued in appellate brief).

### VI. CONCLUSION

For the foregoing reasons, we affirm the district court's order dated October 25, 2018.

AFFIRMED.